Filed 10/6/22  In re Z.E. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

CORT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Z.E., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D080310 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15637) |
| v. | |
| N.E. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant N.E.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant M.F.

Claudia Silva, Acting County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Lisa Maldonado, Deputy County Counsel for Plaintiff and Respondent.

N.E. (Father) and M.F. (Mother) appeal from a Welfare and Institutions Code section 366.26[1] order terminating their parental rights to Z.E., their three-year-old son.  Father and Mother contend: (1) the San Diego County Health and Human Services Agency (the Agency) and the juvenile court did not comply with their initial duties to inquire regarding Z.E.'s possible Indian ancestry under section 224.2, subdivisions (b) and (c), which implement in part the federal Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA); and (2) the juvenile court erred by finding the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)) did not apply to preclude the termination of their parental rights.  As we explain below, we do not find any prejudicial error and therefore affirm the order.  In so doing, we adopt and apply the standard of prejudice for section 224.2, subdivision (b) inquiry error set forth in *In re Benjamin M.* (2021) 70 Cal.App.5th 735 (*Benjamin M.*), which we recently discussed and adopted in *In re Y.M.* (2022) 82 Cal.App.5th 901 (*Y.M.*).

FACTUAL AND PROCEDURAL BACKGROUND

In February 2020, the Agency filed a section 300, subdivision (b)(1) dependency petition for then seven-month-old Z.E., alleging that he was at substantial risk of serious physical harm because of domestic violence between Mother and Father in Z.E.'s presence and their methamphetamine use.  In its detention report, the Agency stated that Mother and Father

---

1      All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

continued to have contact with each other despite multiple altercations and multiple restraining orders between them. The Agency also stated that Mother and Father had histories of substance abuse and had been using methamphetamine. It reported that in an interview with a social worker Mother had denied any Indian ancestry. It also reported that in a previous investigation in June 2019 Father had denied he had any Indian ancestry. Accordingly, the Agency recommended that the juvenile court find, without prejudice, that ICWA did not apply to Z.E.'s case. Father filed with the court a form (i.e., 2008 version of ICWA-020) in which he did not check any of the form's boxes asking him whether or not he had any Indian ancestry. However, Father filed a parentage inquiry form in which he checked a box indicating that he did not have any Indian ancestry. Mother filed a form (2020 version of ICWA-020) in which she did not check any boxes asking her to confirm whether she had any Indian ancestry.

At the detention hearing, Mother, Father, the maternal grandmother, the maternal grandfather, and the paternal grandmother appeared. There is no indication in the record that the court asked any of them regarding any Indian ancestry. Mother's counsel represented that Mother had filed a form (ICWA-020) indicating that she had no known Indian ancestry. Father's counsel represented that Father had indicated that he had no Indian ancestry. The court found that neither Mother nor Father was claiming any Indian ancestry and, based thereon, found that Z.E. was not an Indian child and that ICWA did not apply to his case. The court found that the Agency had made a prima facie showing in support of its petition and detained Z.E. in out-of-home care.

In its initial jurisdiction and disposition report, the Agency stated that its social worker had spoken with the paternal grandmother who described

3

Mother's and Father's relationship as "toxic" and discussed Father's history of alcohol and marijuana use. Mother admitted substance use in the past and stated that she and Father had used methamphetamine together. Z.E. had been placed with the paternal grandmother and paternal grandfather.

In its April addendum report, the Agency stated that Father had been unable to complete a drug test and the test administrator suspected he had used methamphetamine based on his behavior and inability to produce saliva. The paternal grandmother was concerned that Father continued to use drugs and had used fake urine to pass drug tests. Although Mother had continued to participate in her parenting classes, she had discontinued participation in her outpatient drug treatment program. Mother and Father continued their contact with each other.

In its July addendum report, the Agency stated that Father had been arrested in May for domestic battery and forcible assault against Mother. Also, in July police had responded to another domestic violence incident between Mother and Father. Mother had been discharged from her outpatient drug treatment program for missing group sessions, failing to complete drug tests, and not responding to calls from her counselor. Father completed a parenting education program and had started therapy sessions, but had not begun domestic violence treatment or completed any drug tests in the past three months. Father had been consistently visiting Z.E., while Mother's visits with him were inconsistent.

In its September addendum report, the Agency stated that Mother had participated in inpatient drug treatment for one or two weeks. Mother stated that she had last used methamphetamine in July and had contacted Father in July or August.

At the contested jurisdiction and disposition hearing in September, the juvenile court made a true finding on the petition's allegations, declared Z.E. a dependent of the court, placed him with the paternal grandparents, and ordered reunification services for the parents. The court also found that no ICWA notice was required because it knew Z.E. is not an Indian child.

In its six-month status review report submitted in March 2021, the Agency recommended that the court continue Z.E. as a dependent in out-of-home care with reunification services for the family. Father had submitted to only one of the three drug tests requested by the Agency during the review period, testing positive for methadone. The Agency had no evidence showing Father had participated in substance abuse treatment during the review period. After initially having negative drugs tests, Mother had recently tested positive for methamphetamine and alcohol. Her outpatient substance abuse treatment program counselor informed an Agency social worker that she had not made progress in her attendance and participation and recommended that she instead receive residential treatment. Z.E. had continued to thrive in his placement with the paternal grandparents. His parents continued to have separate weekly supervised visits with him.

At the contested six-month review hearing in April, the court found that reasonable inquiry had been made whether Z.E. is, or may be, an Indian child and found that no ICWA notice was required because it knew Z.E. is not an Indian child. The court continued Z.E. as a dependent of the court in the care of the paternal grandparents with reunification services.

In its 12-month status review report submitted in April, the Agency recommended that the court terminate reunification services and set a section 366.26 permanency planning hearing. It reported that Father was inconsistent with therapy, did not participate in domestic violence education,

5

and did not submit to a drug test it had recently requested. Mother continued to reside in the home of the maternal grandmother. Mother admitted that she had a drug relapse in March. The parents had recent telephone contact between them. Father had positive visits with Z.E. He was caring, responsive, and focused on Z.E. and they enjoyed spending time together. During her visits with Z.E., Mother was prepared with activities and interacted with him on his level. Z.E. would seek Mother out for comfort and reassurance. The Agency believed that Mother and Father had shown no insight regarding its safety concerns for Z.E. and, based on their lack of progress in services and adherence to court directives, recommended that the court terminate their reunification services and set a section 366.26 hearing.

In its June addendum report, the Agency stated that neither Mother nor Father had submitted to its requested drug testing during the review period. Mother had been discharged from therapy for excessive absences and from her domestic violence program for noncompliance with its directives. The maternal grandmother believed that Mother and Father were using drugs. The Agency stated its belief that although Father and Z.E. continued to enjoy weekly visits, Father's failure to address his substance abuse and domestic violence issues outweighed those positive visits.

At the contested 12-month review hearing in June, the court terminated the parents' reunification services and set a section 366.26 hearing. The court found that reasonable inquiry had been made whether Z.E. is, or may be, an Indian child and found that no ICWA notice was required because it knew Z.E. is not an Indian child. The court continued Z.E. as a dependent of the court in the care of the paternal grandparents.

In its section 366.26 report submitted in September, the Agency stated that Z.E. had been placed with the paternal grandmother and paternal

6

grandfather since February 2020 and had been thriving in their home. An assessment of Z.E.'s needs had shown strengths in his resiliency and his family support system. The paternal grandmother and paternal grandfather were motivated and eager to adopt Z.E. and had been approved for adoption. The Agency believed that Z.E. was both generally and specifically adoptable, but requested additional time to assess the likelihood of his adoption and recommend a permanent plan for him.

In its December addendum report, the Agency recommended that the court terminate Mother's and Father's parental rights and select a permanent plan of adoption for Z.E. It reported that Mother had been arrested in November on various charges, including attempted robbery, driving under the influence, and hit and run, and was currently detained in jail. The paternal grandparents stated that Mother's last contact with Z.E. was in October. The paternal grandparents described Z.E.'s visits with his parents as "fun play date[s]" and he referred to them as "park day[s]." He referred to Mother as "mama" and Father as "dad." Z.E. did not exhibit any emotional or behavioral concerns before or after visits with his parents. Although Z.E. had formed a relationship with each parent and enjoyed his visits with them, the Agency believed that "there is minimal strength in his relationship with each parent." The Agency opined that Z.E.'s relationship with Mother was similar to that of a relative who is familiar and visits occasionally. The Agency believed that the benefits to Z.E. of adoption outweighed the benefits to him of maintaining a relationship with Mother and therefore it would not be detrimental to Z.E. to terminate her parental rights. The Agency opined that Z.E.'s relationship with Father was similar to that of a family member who is familiar and maintains visits. The Agency believed that the benefits to Z.E. of adoption outweighed the benefits to him

7

of maintaining a relationship with Father and therefore it would not be detrimental to Z.E. to terminate his parental rights. The Agency acknowledged that Z.E. might adversely react to a discontinuation of his visits with his parents, but it was unclear what that reaction would be. It described Z.E. as resilient, having adjusted to times when he had no visits or contact with either parent. Any adverse reactions or emotions that he might suffer from the discontinuation of his visits with his parents and the termination of their parental rights could be addressed with play therapy, consistent care, and stability. The Agency believed that adoption would provide Z.E. with the opportunity to experience a sense of belonging to a family unit, security, consistent care, consistent relationships, and, most importantly, stability.

In its addendum report submitted in February 2022, the Agency continued to recommend termination of parental rights and selection of adoption as Z.E.'s permanent plan. The Agency stated that Mother remained incarcerated in jail and had no contact with Z.E. since her incarceration. Father continued his supervised visits with Z.E. during which Father appropriately engaged with him. Z.E. did not exhibit any emotional or behavioral concerns before or after his visits with Father.

In its addendum report submitted in April, the Agency stated that Mother remained incarcerated in jail. Father had a number of supervised visits with Z.E. during the past month. Father's visits with Z.E. were appropriate and Z.E. enjoyed playing with him. The Agency continued to recommend that the court terminate parental rights and select a permanent plan of adoption for Z.E.

At the contested section 366.26 hearing on April 15, 2022, the juvenile court admitted in evidence the Agency's reports and a bonding study by

8

Elizabeth Stanton, Psy. D., dated March 10, 2022. The court also heard testimony from Agency social worker Lisa Salsbury, Dr. Stanton, and Father. After hearing closing arguments of counsel, the juvenile court found that Z.E. was adoptable, terminated Mother's and Father's parental rights, and selected adoption as Z.E.'s permanent plan. The court found that none of the exceptions under section 366.26, subdivision (c)(1) applied to preclude termination of parental rights. It also found that ICWA did not apply to Z.E.'s case. The court set a postpermanency planning review hearing for October 13. Mother and Father each timely filed a notice of appeal challenging the section 366.26 order.

## DISCUSSION

### I

### *ICWA Inquiry Duties*

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).) ICWA provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and their right to intervene. (25 U.S.C. § 1912(a); see also, *Isaiah W.*, at p. 8.) California law also requires such notice. (§ 224.3, subd. (a) ["If a court [or] a social worker . . . knows or has reason to know . . . that an Indian child is involved, notice pursuant to [ICWA] shall be provided for hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement . . . ."].) Both ICWA and California law define an

9

"Indian child" as a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); § 224.1, subds. (a), (b).)

Sections 224.2 and 224.3 set forth California's current ICWA inquiry and notice requirements for juvenile dependency cases. Under sections 224.2 and 224.3, the Agency and the juvenile court are generally obligated to: (1) conduct an initial inquiry regarding whether there is a reason to believe the child is, or may be, an Indian child; (2) if there is, then further inquire whether there is a reason to know the child is an Indian child; and (3) if there is, then provide ICWA notice to allow the Indian tribe to make a determination regarding the child's tribal membership. (See *In re D.S.* (2020) 46 Cal.App.5th 1041, 1048–1052; *In re Austin J.* (2020) 47 Cal.App.5th 870, 882–885.)

Section 224.2, subdivision (a) imposes on the juvenile court and the Agency "*an affirmative and continuing duty to inquire* whether a child for whom a petition under Section 300 . . . has been filed, is or may be an Indian child[.]" (Italics added.) Section 224.2, subdivision (b) establishes the Agency's duty of initial inquiry, providing:

> "If a child is placed into the temporary custody of [the Agency] . . . , [the Agency] . . . has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, *extended family memb*ers, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (Italics added.)

Section 224.2, subdivision (c) imposes on the juvenile court an independent duty of inquiry, providing: "[a]t the first appearance in court of each party, the court shall ask each participant present in the hearing whether the

10

participant knows or has reason to know that the child is an Indian child" and "the court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is a Indian child."

Section 224.2, subdivision (e) imposes a duty of further inquiry on the Agency and juvenile court, providing:

> "If the court [or] social worker . . . has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is a reason to know that the child is an Indian child, the court [or] social worker . . . shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable."

Before the juvenile court can find that ICWA does not apply to a child's case, it must make a finding that "due diligence as required in this section [has] been conducted." (§ 224.2, subd. (i)(2).)

We review a juvenile court's findings that the Agency has made reasonable inquiries regarding a child's possible Indian ancestry under ICWA and that the Agency has complied with ICWA's notice requirements, or that no such notice is required, for substantial evidence. (*In re Charlotte V.* (2016) 6 Cal.App.5th 51, 57.)

II

*Noncompliance with Section 224.2 Duties of Initial Inquiry*

Father contends, and Mother joins in his contention, that substantial evidence does not support the juvenile court's finding that ICWA does not apply to Z.E.'s case and, in particular, that substantial evidence does not support its implied findings under section 224.2, subdivision (i)(2) that the Agency complied with its duty of initial inquiry under section 224.2, subdivision (b) and that the court complied with its duty of inquiry under

11

section 224.2, subdivision (c). The Agency concedes that it and the court erred in failing to comply with their respective inquiry duties. Based on our review of the record, we agree that the Agency and the court did not comply with their section 224.2 inquiry duties.

A

Father asserts, and the Agency acknowledges, that the Agency's initial ICWA inquiry was deficient because it failed to ask him and Z.E.'s extended family members, including his paternal grandmother, paternal grandfather, and maternal grandmother, about the possibility of Z.E.'s Indian ancestry, despite the fact that the Agency had spoken with them on multiple occasions and they appeared at many of the dependency hearings. The Agency's duty to make an initial inquiry into Z.E.'s possible Indian ancestry applies to "parents," which includes Father, and "extended family members," which includes the paternal grandmother, paternal grandfather, and maternal grandmother. (§ 224.1, subd. (c) ["extended family member" is defined as provided in 25 U.S.C. § 1903; § 224.2, subd. (b) [duty of initial inquiry includes "asking . . . parents [and] extended family members"]; cf. 25 U.S.C. § 1903(2) [term "extended family member" includes child's grandparents].) The Agency concedes, and we agree, that it failed to comply with its duty of initial inquiry in this case. (Cf. *Y.M.*, *supra*, 82 Cal.App.5th at pp. 909–910 [error in finding ICWA did not apply where agency had contact with paternal grandmother and paternal grandfather, but did not ask them about possible Indian ancestry]; *In re J.C.* (2022) 77 Cal.App.5th 70, 78–79 (*J.C.*) [error in finding ICWA did not apply where agency had regular contact with paternal grandmother and maternal grandmother was readily accessible, but it did not ask them about possible Indian ancestry]; *In re Darian R.* (2022) 75 Cal.App.5th 502, 509 (*Darian R.*) [error in finding ICWA did not apply where

12

agency had contact with maternal aunt and maternal grandfather, but it did not ask them about possible Indian ancestry].)  Because substantial evidence does not support the juvenile court's implicit finding that the Agency complied with its duty of initial inquiry under section 224.2, subdivision (b), we conclude the court erred by finding at the section 366.26 hearing that ICWA did not apply to Z.E.'s case.

B

Father also asserts, and Mother joins in his assertion, that the juvenile court did not comply with its duty of inquiry under section 224.2, subdivision (c) because it failed to ask Mother, Father, and Z.E.'s extended family members, including his paternal grandmother, paternal grandfather, and maternal grandmother, about the possibility of Indian ancestry, at their first appearances at hearings during Z.E.'s dependency proceedings.  Father correctly asserts that the court should have inquired of Mother and him about any possible Indian ancestry at their many appearances at hearings and should not have simply accepted their ICWA-020 forms at the detention hearing without questioning them further.  By failing to inquire of Mother and Father at their first appearances at hearings, the court did not comply with its section 224.2, subdivision (c) duty of inquiry.  The record also shows that the paternal grandmother appeared at the detention hearing, contested jurisdiction and disposition hearing, contested six-month review hearing, 12-month review hearing, and contested section 366.26 hearing.  The paternal grandfather appeared at the contested 12-month review hearing and contested section 366.26 hearing.  The maternal grandmother appeared at the detention hearing and initial jurisdiction and disposition hearing.  However, there is no indication in the record that at any of their appearances at hearings the juvenile court asked the paternal grandmother, paternal

13

grandfather, or maternal grandmother about any possible Indian ancestry. By failing to inquire of Z.E.'s extended family members at their first appearances at hearings, the court did not comply with its section 224.2, subdivision (c) duty of inquiry. Furthermore, as Father asserts, there is no indication in the record, and therefore substantial evidence does not support a finding, that the court complied with its duty to ascertain of the Agency about its due diligence efforts in inquiring about Z.E.'s possible Indian ancestry. (§ 224.2, subd. (i)(2); cf. *J.C.*, *supra*, 77 Cal.App.5th at p. 70; *In re N.G.* (2018) 27 Cal.App.5th 474, 482.) Accordingly, based on the failures of the Agency and the juvenile court to comply with their respective duties of inquiry under section 224.2, we conclude the court erred by finding at the section 366.26 hearing that ICWA did not apply to Z.E.'s case.

III

*Harmless Section 224.2 Error*

Father contends, and Mother joins in his contention, that the juvenile court's findings that the Agency complied with section 224.2, subdivision (b), that the court complied with section 224.2, subdivision (c), and that ICWA did not apply to Z.E.'s case, which findings we concluded above are not supported by substantial evidence, constitute reversible per se error. Alternatively, he appears to argue that if the errors are not reversible per se, they are prejudicial under the standard set forth in *Benjamin M.*, *supra*, 70 Cal.App.5th 735. The Agency notes that there is currently a wide and varied split among the Courts of Appeal regarding the appropriate standard of prejudice to apply in section 224.2 inquiry error cases. The Agency disagrees that the errors in this case are reversible per se and are, instead, harmless under any of the various standards of prejudice adopted by Courts of Appeal. We conclude that section 224.2 errors are not reversible per se, but instead

14

state law errors that require reversal only if they have caused a miscarriage of justice under California Constitution, article VI, section 13. In *Y.M.*, *supra*, 82 Cal.App.5th at pages 910 to 913, we interpreted that general standard for prejudicial error in the context of juvenile dependency cases in which the Agency has not complied with its section 224.2, subdivision (b) duty of initial inquiry and concluded that the standard of prejudice set forth in *Benjamin M.*, *supra*, 70 Cal.App.5th 735, is the most appropriate standard. Applying that standard to the record in this case, we conclude Father and Mother have not carried their burden on appeal to show that the section 224.2 inquiry errors, discussed above, are prejudicial and require reversal of the section 366.26 order terminating their parental rights.

A

In *Benjamin M.*, *supra*, 70 Cal.App.5th 735, the court adopted a new standard of prejudice to apply in ICWA inquiry error cases, stating:

> "[I]n ICWA cases, a court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but *where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child. . . .* In such cases, courts have generally avoided applying broad, rigid reversal rules and instead focused on *whether the missing information was readily obtainable and whether such information would have shed meaningful light on the inquiry that the agency had a duty to make.*" (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744, italics added.)

In the circumstances of that case, the father never appeared in the juvenile court and was never asked whether he had reason to believe the child was an Indian child. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Furthermore, the agency had not asked extended family members, such as the father's brother and sister-in-law, whether the child had Indian ancestry. (*Ibid.*)

15

*Benjamin M.* concluded that the missing information was both readily obtainable and would likely have shed meaningful light on the question of whether there was reason to believe the child was an Indian child and therefore conditionally reversed the order and remanded for ICWA compliance. (*Id.* at pp. 744, 746.)

In *Y.M.*, we concluded that the *Benjamin M.* standard of prejudice is the closest of the various strains of prejudice standards adopted by the Courts of Appeal to achieving a proper balance of our State constitutional requirement of a miscarriage of justice for reversal and the imposition of appropriate consequences on appeal, in consideration of the rights of parents and Indian tribes, when an agency fails to comply with its section 224.2, subdivision (b) duty of initial inquiry regarding a child's possible Indian ancestry. (*Y.M.*, *supra*, 82 Cal.App.5th at p. 916.) Accordingly, until such time that the California Supreme Court directs otherwise, we conclude that the *Benjamin M.* standard should be applied in determining the prejudicial effect of an agency's failure to comply with its section 224.2, subdivision (b) duty of initial inquiry, as well as a juvenile court's failure to comply with its section 224.2, subdivision (c) duty of inquiry.

B

Applying the *Benjamin M.* standard of prejudice to the juvenile court record in this case, we conclude Father and Mother have not carried their burden on appeal to show the Agency's and juvenile court's failures to comply with their section 224.2 duties of initial inquiry are prejudicial and require reversal of the section 366.26 order terminating their parental rights. Here, the record shows that both Mother and Father had denied any Indian ancestry. Mother denied to an Agency social worker that she had any Indian ancestry, filed an ICWA-020 form denying such ancestry, and her counsel

16

represented at the detention hearing, in Mother's presence, that Mother had indicated that she did not have any Indian ancestry. In June 2019, Father had denied to an Agency social worker during a previous investigation that he had any Indian ancestry. Father also filed a parentage inquiry form in the instant case in which he denied any Indian ancestry. At the detention hearing, in Father's presence, his counsel represented that Father had denied any Indian ancestry. Also, Mother lived with the maternal grandmother during Z.E.'s dependency proceedings. Importantly, the paternal grandmother and paternal grandfather had been Z.E.'s caregivers since February 2020 and were seeking to adopt him.

As we concluded above, the Agency failed to comply with its section 224.2, subdivision (b) duty of initial inquiry and the juvenile court failed to comply with its section 224.2, subdivision (c) duty of inquiry because they did not ask Father and Z.E.'s extended family members (e.g., the paternal grandmother, paternal grandfather, and maternal grandmother) about possible Indian ancestry. Because the record shows the Agency had multiple contacts with Father, the paternal grandmother, paternal grandfather, and maternal grandmother, and those persons also appeared at one or more of Z.E.'s dependency hearings, we presume, as Father asserts, that any information those persons could have provided to the Agency and the juvenile court was "readily obtainable" within the meaning of *Benjamin M.* (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) However, assuming that information was "readily obtainable," we nevertheless conclude the record in this case does not show that readily obtainable information was "likely to bear meaningfully upon whether [Z.E.] is an Indian child" or, alternatively stated, "would have shed meaningful light on the inquiry that the agency [or juvenile court] had a duty to make." (*Ibid.*)

17

Importantly, we first reject Father's conclusory assertion that, if he had been asked by the Agency or the juvenile court about any possible Indian ancestry, he would have provided them with information that was likely to bear meaningfully on the inquiry of whether Z.E. is, or may be, an Indian child. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Father had denied any Indian ancestry during a previous investigation by the Agency, had filed a parentage inquiry form in this case denying any Indian ancestry, and was present when his counsel represented that he had denied any Indian ancestry. Also, because he opposed the termination of his parental rights, Father had a motive to raise any Indian ancestry that may have afforded him additional rights or protection. (Cf. *Y.M.*, *supra*, 82 Cal.App.5th at p. 917 [father presumably had motive to ask paternal grandmother about any possible Indian ancestry that may have afforded him additional rights or protection under ICWA].) We further note that Father has *not*, at any point during Z.E.'s dependency proceedings in the juvenile court or on appeal in this court, represented that he has any Indian ancestry. Accordingly, we are not persuaded by Father's assertion that if he had been asked by the Agency or the juvenile court about any possible Indian ancestry, he could have provided them with information that was likely to bear meaningfully on the inquiry of whether Z.E. is, or may be, an Indian child. (*Benjamin M.*, at p. 744.)

Also, because Mother lived with the maternal grandmother during the dependency proceedings, Mother presumably could have asked her at any time whether she knew of any possible Indian ancestry. Given her close and regular proximity to the maternal grandmother, we presume Mother had a motive to ask, and could have easily asked, her about any possible Indian ancestry that may have afforded Mother additional rights or protection under

18

ICWA. Therefore, we cannot simply adopt Father's and Mother's conclusory assertion that if the Agency or juvenile court had asked the maternal grandmother about any Indian ancestry, she would have provided information that was likely to bear meaningfully on the question of whether there was reason to believe Z.E. is, or may be, an Indian child. (Cf. *Y.M.*, *supra*, 82 Cal.App.5th at p. 917 [because father lived with paternal grandmother during dependency proceedings, he presumably had motive and opportunity to ask her about any possible Indian ancestry that may have afforded him additional rights or protection under ICWA]; *Darian R.*, *supra*, 75 Cal.App.5th at p. 510 [because mother lived with maternal grandfather and maternal aunt, mother did not meet her burden on appeal to show that agency's inquiry of those extended family members "would have meaningfully elucidated the children's Indian ancestry"].)

Also, because during the dependency proceedings the paternal grandmother and paternal grandfather were Z.E.'s caregivers and were seeking to adopt him, they presumably would have had a strong incentive to raise any Indian ancestry in support of that goal, but they chose not do so. (Cf. *Y.M.*, *supra*, 82 Cal.App.5th at pp. 917–918 [because paternal grandfather sought placement of child, he would have had strong incentive to raise Indian ancestry in support of that goal]; *In re S.S.* (2022) 75 Cal.App.5th 575, 582 [because maternal grandmother sought placement of child, she would have strong incentive to raise any "facts that suggest that [child] is an Indian child"].) Therefore, we likewise conclude that Father and Mother have not carried their burden to show that if the Agency or juvenile court had asked the paternal grandmother and/or paternal grandfather about any Indian ancestry, that they would have provided information that was

likely to bear meaningfully on the question of whether there was reason to believe Z.E. is, or may be, an Indian child. (*Ibid*.)

Accordingly, given Mother's and Father's denials of any Indian ancestry and our conclusion above that had the Agency and the juvenile court asked Father, the paternal grandmother, the paternal grandfather, and the maternal grandmother about any possible Indian ancestry, their information was not likely to bear meaningfully on the question of whether there was reason to believe Z.E. is, or may be, an Indian child, we conclude the Agency's failure to comply with its section 224.2, subdivision (b) duty of initial inquiry and the juvenile court's failure to comply with its section 224.2, subdivision (c) duty of inquiry are harmless errors. (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.)

Father's and Mother's conclusory arguments to the contrary do not persuade us to reach a different result. Likewise, none of the cases they cite are factually apposite to this case or otherwise persuade us to reach a contrary conclusion. (See, e.g., *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 745 [because father never appeared and was not asked by agency about any Indian ancestry, information that agency could have readily obtained from paternal relatives was likely to bear meaningfully on whether child was Indian child].) Father and Mother simply speculate that Father, the paternal grandmother, the paternal grandfather, or maternal grandmother would have provided the Agency or the juvenile court with information that was likely to bear meaningfully on the question of whether there was reason to believe Z.E. is, or may be, an Indian child. By so arguing, they have not carried their burden on appeal to show prejudicial error.

IV

*Beneficial Parent-Child Relationship Exception*

Father contends, and Mother joins in his contention, that the juvenile court erred by finding the beneficial parent-child relationship exception did not apply to preclude the termination of their parental rights.  In particular, Father asserts the juvenile court wrongly assumed, and considered as a factor, that Father's relationship with Z.E. would continue after termination of his parental rights because Z.E. would be adopted by his paternal grandparents.

A

"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "[W]hen the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Ibid*.)  The purpose of a section 366.26 hearing is to determine and implement the appropriate permanent plan for a dependent child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  The juvenile court can choose among three permanent plans: adoption, legal guardianship, and long-term foster care.  (§ 366.26, subd. (b).)  When a child is adoptable, adoption is the preferred permanent plan unless there are countervailing circumstances or adoption is not in the child's best interest.  (*In re Heather B.* (1992) 9 Cal.App.4th 535, 546; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

At a section 366.26 hearing, it is the parent's burden to show an exception to termination of parental rights.  (*In re Fernando M.* (2006) 138

21

Cal.App.4th 529, 534; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) One exception is when the juvenile court finds "a compelling reason" for determining that termination of parental rights would be "detrimental" to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The California Supreme Court has clarified that the "compelling reason" language does not impose on the parent any burden beyond the requirement to show termination of the beneficial relationship would be "detrimental" to the child. (*Caden C., supra*, 11 Cal.5th at p. 635.)

*Caden C.* stated that under section 366.26, subdivision (c)(1)(B)(i), a parent has the burden to show, by a preponderance of the evidence, three things: (1) "regular visitation and contact with the child;" (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship;" and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.) Specifically, in making the determination of whether the beneficial parent-child relationship exception applies, the juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Because interaction between a child and his or her parent will generally confer some incidental benefit to the child, the parent must prove the child will benefit to

such a degree as to overcome the preference for adoption. (*Ibid*.) The beneficial parent-child relationship exception is not established simply by a showing of a parent's frequent and loving contact and relationship with their child. (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.) Some of the factors the juvenile court should consider when determining whether the parent-child relationship is important and beneficial are: (1) the age of the child; (2) the portion of the child's life spent in the parent's custody; (3) the positive or negative effect of interaction between the parent and the child; and (4) the child's particular needs. (*Caden C.*, at p. 632; *Autumn H.*, at p. 576.)

On appeal, we apply a hybrid standard in reviewing a juvenile court's determination whether the beneficial parent-child relationship exception applies. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–641; *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530–531.) We apply the substantial evidence standard of review to the factual issues of maintenance of regular contact and visitation and the existence of a beneficial parent-child relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child. (*Caden C.*, at pp. 639–641; *In re J.C.*, at pp. 530–531.) Under the substantial evidence standard of review, we consider the evidence, and make all reasonable inferences therefrom, favorably to support the court's order and disregard contrary evidence as not accepted by the court as having sufficient veracity or persuasiveness. (*Caden C.*, at p. 640; *In re S.B.* (2008) 164 Cal.App.4th 289, 297–298 (*S.B.*).) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason, and, in so doing, we cannot substitute our view for that of the juvenile court. (*Caden C.*, at p. 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 (*Stephanie M.*).)

23

B

At the section 366.26 hearing on April 15, 2022, the juvenile court admitted in evidence, and considered, the Agency's reports and Dr. Stanton's bonding study. The court also heard testimony from Salsbury (an Agency social worker), Dr. Stanton, and Father. In her study, Dr. Stanton stated that she had observed two visits between Father and Z.E. She described their activities during those visits. Father actively engaged with Z.E. and initiated positive interactions with him. When Z.E. fell, he sought out Father's assistance. Father provided efficient and effective comforting to Z.E. and was attentive to his signals and needs. Z.E. addressed Father as "Dad" and "Dada." He seemed relaxed and reacted positively to Father's physical closeness. Dr. Stanton concluded that her observations of the visits showed Father and Z.E. had a healthy and secure attachment pattern. In general, Father's and Z.E.'s interactions were positive, playful, reciprocal, and appropriate. Dr. Stanton recommended that any determinations regarding Father and Z.E. consider their secure attachment pattern.

In her testimony, Agency social worker Salsbury stated that Father had visited Z.E. throughout the reunification period. His visits were appropriate and enjoyable for Z.E. He called Father "Dad." Salsbury began observing visits between Father and Z.E. in January 2022 and had observed the two March visits that Dr. Stanton had observed. Salsbury believed that Z.E. had a substantial positive attachment to Father even though he did not assume a parental role in his life. It was her opinion that even if Z.E. no longer had contact with Father, he would benefit a lot from adoption through safety, security, and a sense of belonging and therefore adoption was the appropriate permanent plan for him. Although Z.E. may suffer some

24

detriment if parental rights were terminated, that detriment would be outweighed by the benefits of adoption. Salsbury testified: "[Z.E.] is a resilient little boy who's been in out-of-home care for almost two years and . . . if he should experience any kind of distress if visitation should cease, . . . that can be overcome and addressed by therapy and other supports." Z.E. had not asked about Father in between visits and separated easily from Father at the end of visits. The paternal grandfather was a father figure to Z.E. Salsbury testified that if parental rights were terminated, there was no guarantee that Z.E. would continue to see Father or the maternal relatives thereafter. When asked by the court, Salsbury replied that the impact of adoption making Father, in effect, Z.E.'s sibling depended on how the paternal grandparents chose to label their relationship and that label could assist Z.E. with his relationship with Father.

Dr. Stanton testified that Z.E. had a substantial, positive emotional attachment to Father. Father and Z.E. had a positive, healthy father-son relationship. Although Z.E. separated easily from Father at the end of visits, that indicated he was secure that he would see Father again. There was a possibility that Z.E. would experience some loss if his relationship with Father was terminated. However, it was unknown if Z.E. would suffer detriment if his relationship with Father was severed. Z.E. could have behavioral struggles that may or may not be ameliorated by therapy or other interventions. Z.E. could suffer ambiguous loss. Disruption of their visitation could result in identity issues for Z.E. as he progressed from childhood to adulthood. Because Father and Z.E. had a biological relationship, the fact that their interaction was limited to play time should not be negated. Her assessment of their bond considered their biological relationship. Z.E. would benefit from continuing his relationship with, and

25

attachment to, Father. If Z.E. and Father had a sibling relationship and continued to have contact, termination of parental rights may ameliorate any sense of loss. However, for purposes of deciding if the beneficial parent-child relationship exception applied, it must be presumed that Father and Z.E. would cease having contact if parental rights were terminated. Any negative impacts on Z.E. from termination of his relationship with Father would be mitigated by a strong adoptive placement.

Father testified that he and Z.E. had an extremely close bond. He wanted to have more visits with Z.E., but their visits had been limited by the Agency. He was sober and wanted to raise Z.E.

After considering the evidence and hearing closing arguments of counsel, the juvenile court found that Z.E. was adoptable. In finding that the beneficial parent-child relationship exception did not apply to preclude the termination of Mother's and Father's parental rights, the juvenile court found that Father had regular and consistent visitation with Z.E., but Mother had not. It also found that Father had shown Z.E. had a positive emotional attachment with him. It found that Mother had not shown Z.E. had a positive emotional attachment with her. Neither Mother nor Father had shown that it would be detrimental to Z.E. to have his relationship with them terminated within the meaning of the beneficial parent-child relationship exception.

In concluding that Father had not carried his burden to show that exception did not apply to preclude Z.E.'s adoption, the juvenile court noted that it was "a difficult balancing" of the detriment to Z.E. of terminating his relationship with Father against the benefits to Z.E. of adoption. It noted that Dr. Stanton was very sincere in recognizing the potential detriment to Z.E. of termination of his relationship with Father and had characterized it

26

as an ambiguous loss.  However, Dr. Stanton stated that there was nothing that indicated Z.E. would, in fact, experience difficulties after termination of his relationship with Father.

The court stated:

> "[T]he Supreme Court instructed the trial court not to do comparison of different environments.  But the Supreme Court has not yet looked at the situation like this where there is a grandparent adoption and the biological ties will be adjusted but not necessarily extinguished.  Parental rights are, but the biological ties are not.
>
> "And Dr. Stanton was very clear that the fact that there are those existing but, perhaps, ancillary biological ties, that that would smooth the trauma, if any, that [Z.E.] experiences in the future.
>
> "[Z.E.] clearly reacts appropriately for feelings of safety and security with his grandparents.
>
> "And, again, I'm not comparing environments.  I'm indicating that from the standpoint of assessing detriment, the stage has already been set that should [Z.E.] experience these occurrences, that the grandparents are not only in tune, but well-equipped to assist [him].  So that would ameliorate to in my mind a large extent any detriment that can be identified.
>
> "Here I cannot find by a preponderance of the evidence that it would be detrimental to [Z.E.] on this record.  Clearly, he will be impacted.  Clearly, there may be issues of confusion.  But, again, with the biological ties, the proactive nature of the grandparents' assistance of this young man, that any disruption of interference would not be traumatic, as I understand how that term is to be used in the statute.
>
> "Even if it were to be determined that it would be detrimental to [Z.E.], I do find that the countervailing benefits of adoption . . . would outweigh the considerations of detriment."

27

Accordingly, the court found that Father had not carried his burden to show that the beneficial parent-child relationship exception applied to preclude termination of his parental rights. The court then terminated Mother's and Father's parental rights and selected adoption as Z.E.'s permanent plan.

C

Father argues, and Mother joins in his argument, that the juvenile court erred in concluding the beneficial parent-child relationship exception did not apply to preclude the termination of his parental rights.[2] Mother argues that if Father shows that the court erred by concluding that exception applied, neither Father's nor Mother's parental rights should have been terminated by the court. In particular, Father argues that the court wrongly assumed that Z.E.'s relationship would continue despite termination of Father's parental rights because the paternal grandparents would adopt Z.E. Based on our reading of the court's statements at the section 366.26 hearing, we disagree.

First, Father argues, and the Agency concedes, that substantial evidence supports the juvenile court's findings on the first two elements of the beneficial parent-child relationship exception. We agree. There is substantial, if not overwhelming, evidence in support of the court's findings that Father maintained regular visitation and contact with Z.E. and that Z.E.

---

[2]    Mother does not argue on appeal that the juvenile court erred by finding that she did not maintain regular visitation and contact with Z.E. and that he did not have a substantial, positive emotional attachment to her. Nevertheless, based on our review of the record, we conclude substantial evidence supports those findings by the court. Therefore, the court properly concluded that the termination of Z.E.'s relationship with Mother would not be detrimental to him and therefore the beneficial parent-child relationship exception did not apply as to termination of his relationship with Mother.

28

had a substantial, positive emotional attachment to Father. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

Second, regarding the third element of the beneficial parent-child relationship exception, Father misconstrues the court's statements at the section 366.26 hearing by asserting that the court assumed Z.E.'s relationship with Father would continue after his adoption because of his biological ties to Father. Although Father correctly argues that after Z.E.'s adoption by the paternal grandparents Z.E. and Father may be considered siblings, he does not persuade us that the court assumed that Z.E. would continue to have a relationship with Father after adoption. Here, the court noted that it had "careful[ly] read" *Caden C.* and, based thereon, we presume that it implicitly considered the Supreme Court's statement therein that the third element requires a juvenile court to "determine . . . how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) More importantly, we presume the juvenile court here was aware of, and considered, the following statement in *Caden C.*: "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Ibid.*) Furthermore, Salsbury testified that if parental rights were terminated, there was no guarantee that Z.E. would continue to see Father. Dr. Stanton testified that for purposes of deciding if the beneficial parent-child relationship exception applied, it must be presumed that Father and Z.E. would cease having contact if parental rights were terminated. The Agency's counsel argued in closing that in considering the third element of the exception, the court "must look at what the child's life would look like if visits

29

were to end." Likewise, Father's counsel argued in closing that the court must assume Z.E.'s visitation and relationship with Father would be terminated if he were adopted. He argued: "The Court must not consider the likelihood of future contact just because [Z.E.] is placed with family." Therefore, based on the juvenile court's reading of *Caden C.*, testimony of witnesses at the contested section 366.26 hearing, and closing arguments of counsel, we conclude the court was necessarily aware that, in deciding the third element of the beneficial parent-child relationship exception, it must assume Z.E.'s relationship with Father would be terminated after his adoption by the paternal grandparents.

Contrary to Father's assertion, the court's statements at the section 366.26 hearing did *not* show that it did, in fact, assume Z.E.'s relationship with Father would continue after his adoption because of his biological ties to Father. As discussed above, the court noted that adoption of Z.E. by the paternal grandparents would "adjust[]" the "biological ties," but "not necessarily extinguish[]" them. The court explained: "Parental rights are [extinguished], but the biological ties are not." In so doing, the court simply noted the obvious—that Z.E. and Father will always have a biological tie in that Father is Z.E.'s biological father. Therefore, the court noted that Z.E.'s adoption by the paternal grandparents would not terminate his biological tie to Father even though Father's parental rights would be terminated. In so recognizing that continuing biological tie, the court did not, as Father asserts, take the additional step of assuming that Z.E. would continue to have a relationship with Father because of that biological tie. At most, in recognizing Z.E.'s biological ties to Father and/or the parental grandparents, the court merely acknowledged that in the context of Z.E.'s case it was possible that his relationship with Father might continue after his adoption if

30

it were fostered by the paternal grandparents, even though for purposes of applying the third element it had to assume that his relationship with Father would terminate after his adoption. Salsbury testified that the paternal grandparents had indicated they were willing to continue to encourage visitation or contact between Z.E. and Father, but noted that such future visitation would be within the complete discretion of the grandparents. By recognizing the context of adoption by the paternal grandparents and Z.E.'s biological ties, the court did not, as Father argues, apply the wrong standard for deciding the third element or otherwise err in deciding that the beneficial parent-child relationship exception did not apply to preclude the termination of his parental rights. None of the cases cited by Father are apposite to this case or otherwise persuade us to reach a contrary conclusion.[3] (See, e.g., *In re C.B.* (2010) 190 Cal.App.4th 102, 128–129 [court improperly considered as factor expectation that prospective adoptive parents would allow continued contact between child and biological parent after adoption].)

Although Father apparently does not expressly argue that the juvenile court otherwise abused its discretion by concluding any detriment Z.E. would suffer from the termination of his relationship with Father was outweighed by the benefits to him of adoption, the evidence supports that balancing by

---

[3] To the extent Father argues the juvenile court must have assumed Z.E.'s relationship would continue with Father after adoption because he would be adopted by the paternal grandparents and his biological ties to Father would continue, albeit adjusted, we disagree. Furthermore, the juvenile court's statement that the Supreme Court had not yet addressed this issue was merely a comment that this particular factual scenario involving a grandparent adoption had yet to be decided by that court. Accordingly, that statement does not show the juvenile court improperly considered as a factor an assumption that Z.E.'s relationship with Father would continue after his adoption.

the court.  Both Dr. Stanton and Salsbury testified that Z.E. might feel sad and/or could suffer some ambiguous or other loss if he no longer had a relationship or contact with Father.  However, Dr. Stanton testified that a strong adoptive family would help a child mitigate any possible negative effects.  Dr. Stanton also testified that Z.E.'s biological ties would help minimize any trauma he might suffer from the termination of his relationship with Father.  Salsbury testified that the paternal grandparents would help Z.E. overcome any such loss or challenges.  Salsbury further testified that if Z.E. were to experience detriment from the termination of his relationship with Father, he was resilient and could overcome that detriment with support and services.  Salsbury testified that adoption would provide Z.E. with the benefits of security and safety, stability in relationships, and a sense of belonging, which benefits would outweigh any harm he might suffer from the termination of his relationship with Father.  Based on that evidence and other evidence in the record, the court reasonably concluded that any detriment Z.E. might suffer from the termination of his relationship with Father would be outweighed by the benefits to him of adoption.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 641.)  Accordingly, we conclude the juvenile court did not abuse its discretion in reaching that conclusion, and we cannot substitute our view for that of the juvenile court.  (*Id.*, at p. 641; *Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

## D

Finally, Mother separately argues that the juvenile court failed to consider that it was in Z.E.'s best interest to maintain his maternal Filipino ethnic and/or cultural identity or ties when it decided that the beneficial parent-child relationship exception did not apply to preclude the termination of her parental rights.  However, because there is substantial evidence to

support, and Mother apparently does not challenge, the juvenile court's findings that she did not show either that she had maintained regular visitation and contact with Z.E. or that he had a substantial, positive emotional attachment to her, her failure to carry her burden below to show those first two elements of the beneficial parent-child relationship exception precludes her from showing any prejudice from the juvenile court's purported abuse of discretion in deciding the third element, such as by not considering Z.E.'s maternal Filipino ethnic or cultural identity or ties in balancing any detriment he might suffer from the termination of his relationship with Mother against the benefits to him of adoption.[4]

Mother also argues that the juvenile court should have exercised its discretion by selecting a permanent plan for Z.E. of legal guardianship instead of adoption, which guardianship would provide him with permanence and stability without depriving him of his Filipino roots. However, the Legislature has made it clear that there is a strong preference for adoption of adoptable children over other alternative permanent plans. (§ 366.26, subd. (b)(1); *S.B.*, *supra*, 164 Cal.App.4th at p. 297; *Autumn H.*, *supra*, 27

---

[4] To the extent Mother argues in a conclusory manner that Z.E.'s Filipino ethnic or cultural identity or ties are "no less worthy of protection than his Indian ancestry," we disagree and, in particular, note that there are express federal and state statutes, as discussed above, that protect the rights of Indian children, their parents, and Indian tribes. Mother does not cite any apposite statutes protecting the rights of children or parents of other cultures or ancestry (e.g., Filipino) or otherwise require a juvenile court to consider those other cultures or ancestry as a factor in selecting a permanent plan for a child. Contrary to Mother's assertion, *Caden C.*'s description of the beneficial parent-child relationship exception as a "case-specific inquiry" did not require the court to consider that cultural or ancestral factor in concluding that exception did not apply or in selecting adoption as Z.E.'s permanent plan. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

Cal.App.4th at p. 574.)  Accordingly, a juvenile court is not to consider alternative permanent plans unless it had first rejected adoption for a child's permanent plan.  (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164.) Because the juvenile court here reasonably chose adoption as Z.E.'s permanent plan, it could not consider other alternative permanent plans such as legal guardianship which may have allowed Z.E. to maintain his maternal Filipino ethnic or cultural identity or ties.  Accordingly, Mother has not carried her burden on appeal to show the juvenile court erred by concluding the beneficial parent-child relationship exception did not apply to preclude the termination of her parental rights or by selecting adoption as Z.E.'s permanent plan.

## DISPOSITION

The order is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.